IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 10, 2012

## STATE OF TENNESSEE v. WILLIAM FRANKLIN CHUMLEY

**Appeal from the Circuit Court for Tipton County**
**No. 6772     Joseph H. Walker, Judge**

**No. W2011-01832-CCA-R3-CD  - Filed August 1, 2012**

The defendant was convicted by a jury of rape of a child, a Class A felony, and sentenced to serve twenty-five years in prison.  He appeals his conviction, challenging the sufficiency of the evidence supporting the conviction and contending that the victim's identification of him to the sexual assault nurse should have been excluded as hearsay.  Because we conclude that the evidence is sufficient to support the conviction and that the identification was properly admitted into evidence, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and JEFFREY S. BIVINS, JJ., joined.

Gary F. Antrican, District Public Defender; and Melissa A. Downing, Assistant District Public Defender, for the appellant, William Franklin Chumley.

Robert E. Cooper, Jr, Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Mike Dunavant, District Attorney General; Julie K. Pillow, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, William Franklin "Frank" Chumley, was indicted on November 1, 2010 for rape of a child in violation of Tennessee Code Annotated section 39-13-522, after the nine-year-old victim,[1] who had been staying with her relatives next door to the defendant,

---

[1]It has been our policy to refer to the child victims of sex offenses by their initials. In this case, we have decided to protect the identity of all the minors involved by omitting their initials. We will refer to the

(continued...)

told her family she had been sexually assaulted.

At trial, Ben Forbess, a deputy with the Tipton County Sheriff's Office, testified that he was dispatched to the home of the victim's grandmother to take a report concerning the sexual assault of a child. While there, he observed the victim, who appeared frightened and would not leave her mother's side. The victim confirmed that someone had touched her inappropriately. Deputy Forbess did not observe any injuries to the victim but testified he did not look for injuries.

The victim's mother testified regarding the circumstances leading up to the rape. She testified that, at the time, she was separated from the victim's father, but that the victim spent time with both parents; when the victim stayed with her father, the victim's mother would check on her daily. The victim's father lived next door to the victim's grandparents, and the victim's grandparents lived next door to the defendant. The victim spent time at the defendant's house, attracted by the defendant's swimming pool. The victim had also been permitted to spend the night at the defendant's house. On the Friday prior to June 27, 2010, the victim's mother had seen her and noticed nothing out of the ordinary.

On June 27, 2010, the victim's grandmother called the victim's mother at approximately 7:00 p.m. The victim's mother drove to the victim's grandmother's house, and after speaking with the victim, she called law enforcement and gave a report. The victim was scared and crying. The victim's mother took the victim home; at home, the victim told her mother more about the assault, and as a result, the victim's mother and father decided to take her to seek medical care in Memphis at approximately 3:00 a.m. The victim's mother testified that the victim had a bruise on her neck "that it looked like she had been grabbed . . . around her throat area." The victim further had scratches on her arms and legs and complained of severe stomach pain and back pain. The bruises developed after the victim's mother took the victim home. The victim's mother testified that the victim has nightmares and anger and began having trouble in school after the rape.

The victim testified that the defendant raped her. The victim had frequent contact with the defendant because, while staying with her father, the victim would frequently play and swim with the defendant's wife's son. The victim's cousin and the defendant's son were also present on June 27, 2010. After spending the night at the defendant's house, as she had been doing "off and on," the victim had gone swimming in the morning with the defendant's permission. The defendant's wife, Samantha Chumley, left to go to Wal-Mart twenty or thirty minutes prior to the rape. The victim testified that Samantha Chumley's son was in the

[1](...continued)

victim as "the victim" and identify her family members and other minors by their relationships to the parties.

pool, but later testified he had gone to Wal-mart with Samantha Chumley. The victim testified that she and her cousin had been jumping on a trailer and the defendant yelled at them. They came inside the house and she sat on the couch by the defendant's son for five minutes. The defendant was in the kitchen and tried to get her to come over to show her something, but she did not come. She then suggested to her cousin that they go back outside. She testified that as they were leaving the house, the defendant indicated to her cousin that he should go outside and then pulled her into the bathroom. He touched her between her legs, pulled her pants down, and raped her. The victim testified she was crying and attempted to call for help from the defendant's son. She testified that sound from one end of the house could be heard in the other end and she did not know why the defendant's son did not hear or respond to her.

She pushed the defendant away and ran outside to tell her cousin. She asked her cousin to tell the defendant that they were going to their grandmother's house and to tell their grandmother about the assault. On cross-examination, she further elaborated that although her cousin then tried to tell their grandmother, her grandmother was in a bad mood and kept ordering the children to go back to the defendant's house to get their clothes. The victim told her grandmother she did not want to go, but her grandmother insisted, and she and her cousin returned to the defendant's house, where the defendant and his wife gave them hot dogs for dinner; she did not say anything to the defendant's wife. She testified that she was trying to leave, did not go over there to swim, and only stayed for about ten minutes. When they returned, her cousin told her grandmother about the assault. Her grandmother then called her mother. The victim then related the interview with police, the fact that she later told her mother everything, and her visit to Memphis, which she explained was "[s]o they could check me and see if anything was wrong with me." The victim testified she had bruises and scratches and that the defendant had put the bruises and scratches on her. She testified that the defendant didn't say anything except, finally, "Okay, I'll stop."

Amanda Taylor, a sexual assault nurse examiner for the city of Memphis, testified as an expert witness regarding her examination of the victim the morning following the rape. During Nurse Taylor's testimony, the prosecution introduced the report she prepared simultaneously with the examination. In a jury-out hearing, the defense raised a hearsay objection to the entirety of that portion of the report transcribing the narrative the victim gave Nurse Taylor. The defense raised a separate objection to references in the report to other criminal acts against the victim which were not charged in the indictment. The court redacted the report to remove the references to prior bad acts, but allowed the bulk of the narrative in as an exception to the prohibition against hearsay under Tennessee Rules of Evidence 803(4).

Nurse Taylor testified that she prepared the report in the ordinary course of business,

and that her examination included an interview with the victim's parents, an interview with the victim alone, and an internal and external examination. Nurse Taylor read into the record the redacted description the victim gave of the assault:

> He dragged me into the bathroom and covered my mouth. He started touching and kissing on me. He pulled my pants down and then pulled his middle part out (clarified as penis) and put it in my middle part (clarified as vagina). He put it in this far (child held up fingers to show distance – distance measured with ruler and fingers photographed showing distance). I was able to kick the door open and started to run. He grabbed me by the neck and held me up and then he threw me against the wall. I got up and [tried] to run again and he picked me up by my neck again. He was choking me and I couldn't breath[e] so I kicked him and he dropped me, I fell on the floor, then he punched me in the face and kicked me in my stomach and my back. Then he picked me up by my neck again and threw me on the bed and pulled my pants and underwear down and put his middle part in again (clarified middle part as penis). He put his middle part in this far (child holds up fingers. Length measured to be 4 inches – photo taken of child[']s description of length with a ruler). I kicked him off and he smacked my face and held up his keys and asked me if I saw this and that these were the keys to his gun cabine[]t and that he would kill me if I told anyone. He held up some duck tape and threatened to use it on me. I was able to kick him again and was able to run, he almost caught me but he didn't, as I was running he was telling me to tell my parents that the water on my face was from sweat rather than the tears that I was crying. I went to my grandma's house and told her.

Nurse Taylor testified that the evidence from her physical examination of the victim was consistent with the victim's narrative. She found bruising on the front of the victim's neck, on her right knuckle, and on her left ankle, and marks on her right shin, shoulder blade and right hip, as well as a healed scar on her right knee. With the exception of the scar, the injuries had been inflicted within the past seventy-two hours. She also found a laceration or blunt force injury in the area right outside the hymen; Nurse Taylor testified this was an indication of penetration. She testified that there was no tear in the hymen, but that the hymen can remain intact through penetration and even childbirth. She noted it was "highly unlikely" that the laceration was anything other than a sexual injury and "highly unlikely"

that it was self-inflicted. Nurse Taylor collected swabs during the exam, and testified that there is "always some seepage of ejaculate....So...there is always the possibility." The swabs tested negative for semen or alpha-amylase, which is a component of saliva.

Samantha Chumley, the defendant's wife confirmed that the victim had been staying at her house off and on for a few weeks. She testified that sound would travel across the house if it was "loud enough" and confirmed that the TV was on that day; she did not remember if the washer or dryer were going. Ms. Chumley testified that she and her son went to Wal-Mart for thirty to forty-five minutes; she believed that the victim and her cousin were still there when she arrived home. She testified that the victim and her cousin went to their grandmother's house to eat dinner and came back, wanting to go swimming. She testified that they had not gone swimming that day, and testified that when the victim returned, Ms. Chumley could see the straps of a bathing suit under her clothes, and that she saw no marks or bruises on the victim. She testified the children did not stay long when they were told they couldn't go swimming.

On cross-examination, Ms. Chumley was questioned regarding an allegation that she and the defendant had tried to get the defendant's teenaged son to assume responsibility for the rape. Regarding whether she participated in a telephone conversation with the defendant and his son about the defendant's son taking the charge, Ms. Chumley testified: "I don't recall, but I mean, I'm not saying I didn't say it at the time." Ms. Chumley denied that she had kept the defendant's son from calling his mother to retrieve him for three days, and stated that he could have called her and had wanted to stay.

The defendant testified on his own behalf at trial. He confirmed that sound traveled in the house and testified that the house was small enough that someone in the living room could see into any of the bedrooms. According to the defendant, they had planned to swim that afternoon, but he told the children that they couldn't swim because the family had errands. He testified that the victim and her cousin at first wanted to go to Wal-Mart, but changed their minds. The defendant's son was watching either a Harry Potter movie or Avatar in the living room. The defendant testified that when his wife left the house, he got up to use the bathroom, and at that time, his wife, the victim, the victim's cousin, and the victim's grandmother were outside. When he emerged from the bathroom, he saw the victim and her cousin playing on the trailer, and he tapped the window, shook his head, and pointed at the victim . He testified that the victim's cousin did not come in again at that time, but the victim came in the house through the bathroom and bedroom to the living room, sat on the couch, and then came back in the bedroom, nearly bumping into the defendant, who was returning from the bathroom. He testified that the victim told him she wanted to go see her grandmother. The defendant testified the bedroom door was open. He testified the television was on but that he was not doing laundry; he did not recall telling a detective that he was

folding clothes on the bed. The victim and her cousin then went to the victim's grandmother's house. The defendant testified his wife was gone thirty-five to forty-five minutes, and when she returned, she took some purchases to the victim's grandmother. The children then came over to eat, but the victim's grandmother called and told them that the victim's other grandmother was there to pick her up. The defendant testified he did not touch or hurt the victim or have sexual contact with her. According to the defendant, he was watching the movie with his son for the bulk of the time his wife was gone. He testified that the victim and her cousin were angry at him for not allowing them to swim and reprimanding them for playing on the trailer.

The defendant testified that he had told his son that if he committed the crime, he would need to take the charge. He denied telling his son that they had a plan for the defendant to avoid jail or telling his son that if he took the charge, he would not get any time because he was a juvenile. He denied refusing to let his son call his mother or leave for three days.

Shelly Chumley and Dustin Chumley, the defendant's niece and nephew, testified that they had been in almost daily contact with the defendant growing up and maintained very frequent contact as adults. Both testified to his good character and honesty.

The defendant's son, who was seventeen at the time of trial, testified that he had stayed with the defendant for approximately three weeks in June 2010. On June 27th, he was watching *Harry Potter and the Goblet of Fire*, a favorite movie that he had seen several times. He testified that the defendant, the victim, and her cousin were watching the movie with him when Samantha Chumley left for Wal-Mart. He testified that the defendant and the victim were in a different room during part of the time that Ms. Chumley was gone; he was able to pinpoint their absence in relation to the movie by testifying that they were gone from the first task to the middle of the third task. He testified that he got up to see what they were doing in the middle of the second task because they had not reappeared. According to the defendant's son, "Whenever I walked into the laundry room, I saw him bent over with his hands on his knees, looked like he was talking to her . . . . And then I walked back into the living room and sat down." The defendant's son testified that the victim then returned and sat by her cousin in a chair. He did not notice anything about her, but was not looking at her. He did not see the victim or her cousin leave.

The defendant's son also testified that his father and Samantha Chumley tried to persuade him to take the blame for the rape of the victim. He testified his father and step-mother would not let him leave or call his mother, and that eventually his mother came to get him without having been called. According to the defendant's son, he agreed to help them when they told him they had a plan to keep the defendant out of jail, but changed his mind

-6-

when they told him that the plan was that he would take the blame. This plan was revealed to him in face-to-face communications with Samantha Chumley and telephone conversations with the defendant and Samantha Chumley. They attempted to persuade him by telling him he would only be punished by a few days in juvenile hall because of his age. The telephone conversations, which had taken place while the defendant was in jail, were played for the jury. In the recordings, the defendant repeatedly tells his son that if he did something to the victim, he should confess. The defendant informs his son that otherwise the defendant will go to jail for twenty-five years. In one recording, Ms. Chumley repeats that the defendant's son "ain't going to do nothing." The defendant's son acknowledged that the defendant did not tell him to take the blame in the recordings, but testified that when Samantha Chumley states that the defendant's son "ain't going to do nothing," she meant that he had declined to participate in their plan.

The jury found the defendant guilty of rape of a child, a Class A felony. The trial court sentenced the defendant to twenty-five years' incarceration.

**Analysis**

**A. Sufficiency of the Evidence**

The defendant challenges the sufficiency of the evidence, contending that the physical evidence does not support a finding of guilt, that there are discrepancies in the victim's testimony, and that the circumstances lead to reasonable doubt about the defendant's guilt. Tennessee Code Annotated section 39-13-522(a) defines rape of a child as "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." The jury found that the defendant had committed the crime described in Tennessee Code Annotated section 39-13-522.

Tennessee Rules of Appellate Procedure 13(e) requires an appellate court to set aside a conviction "if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." The pivotal inquiry in reviewing the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted). The presumption of innocence which surrounded the defendant at trial is replaced by a presumption of guilt, and it is the defendant's burden to show that the evidence is not sufficient to support the verdict. *State v. Schmeiderer*, 319 S.W.3d 607, 635 (Tenn. 2010). Accordingly, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from the evidence. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn.

1999). All conflicts in evidence are resolved in favor of the State's theory, and the Court may not re-weigh or re-evaluate the evidence. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

The defendant's challenges to the sufficiency of the evidence based on the physical evidence, the victim's testimony, and the circumstances of the crime are essentially challenges to the jury's factual findings regarding the credibility of witnesses and the inferences to be drawn from the evidence. The defendant's contention that the absence of DNA evidence or injury to the victim's hymen requires his conviction to be overturned ignores the fact that Nurse Taylor also testified that the victim's physical injuries, particularly the internal laceration she sustained, were consistent with penetration and that any other explanation was "highly unlikely." Furthermore, Nurse Taylor did not, as the defendant claims, testify that the presence of DNA could always be detected after a rape; she testified that it would always be present and there was "always the possibility" it could be detected. The jury determined what inferences to draw from the circumstances of the crime – including the defendant's son's nearby presence, the fact that the victim returned to the defendant's home to eat hot dogs, and the fact that certain witnesses did not observe injuries on the victim shortly after the attack. It was also the jury's role to make credibility determinations after considering any major or minor discrepancies in witnesses' testimony, including the victim's testimony regarding whether the defendant's step-son was in the pool or at Wal-Mart.

While the defendant attempts to attack the sufficiency of the evidence by pointing to these circumstances and to the existence of other "viable alternatives to the Appellant's guilt," it is not the province of this Court to re-weigh the evidence, even if the evidence supporting guilt were less convincing than it is. At trial, the defendant's nine-year-old victim, using such childlike language as was available to her, testified that the defendant attacked and raped her; an expert witness confirmed that the victim sustained external and internal injuries consistent with her narrative; the victim's mother also testified regarding bruises and scratches on the victim and a change in the victim's behavior after the attack; the defendant's son testified that the defendant and victim were alone during the time the victim said she was assaulted; and the defendant's son testified that the defendant and defendant's wife tried to convince him to take the blame for the rape. We conclude that a rational trier of fact could find the defendant guilty beyond a reasonable doubt.

### B. Admissibility of Hearsay Statements Regarding Identity of the Perpetrator

The defendant also challenges his conviction based on the trial court's denial in part of his motion to suppress the narrative portion of Nurse Taylor's report regarding the assault.

While the trial court redacted the narrative to remove any references to prior bad acts, the court found that the narrative could come into evidence under an exception to the rules regarding the admission of hearsay. Specifically, the trial court found that it was admissible under Tennessee Rules of Evidence 803(4), allowing "[s]tatements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment." The defendant challenges the trial court's ruling regarding the victim's identification of the defendant as the perpetrator, claiming that the identity of the perpetrator was not reasonably pertinent to diagnosis or treatment.

Decisions regarding the admissibility of evidence are within the discretion of the trial court, and the trial court's ruling will not be overturned absent an abuse of discretion. *State v. Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997). Generally, hearsay, or "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," is inadmissible. Tenn. R. Evid. 801, 802. The exception for statements made for the purpose of medical diagnosis and treatment is justified by the principle that the declarant has a strong motivation to tell the truth in order to receive proper medical treatment, and therefore "the declarant's motive of obtaining improved health increases the statement's reliability and trustworthiness." *State v. Barone*, 852 S.W.2d 216, 220 (Tenn. 1993). Furthermore, the physician's reliance on the statement as a basis for diagnosis and treatment renders it sufficiently reliable for a court to admit it into evidence. *State v. McLeod*, 937 S.W.2d 867, 870 (Tenn. 1996).

In evaluating admissibility based on whether the statement was made "for the purposes of medical diagnosis and treatment," the court must examine all the circumstances surrounding a child declarant's statement, including whether the statement was influenced by another, made in response to suggestive questioning, or inspired by disputes within the family. *Stinnett*, 958 S.W.2d at 332. The defendant raises no issue regarding whether the statements were made for the purposes of medical diagnosis and treatment, but challenges the admission of the identification of the defendant as the rapist. We note that the trial court properly held a jury-out hearing regarding the admissibility of the narrative sections of the report; although the parties did not discuss the circumstances under which the statement had been given, the victim had previously testified that she went to Memphis "[s]o they could check me and see if anything was wrong with me." *See State v. Spratt*, 31 S.W.3d 587, 600 (Tenn. Crim. App. 2000) ("While no witness testimony was presented during the hearing, it is apparent that there was no misunderstanding between the parties about the content of the statement and the circumstances under which it was given.").

While the general rule is that the identity of the perpetrator is not "reasonably

pertinent to diagnosis and treatment," the opposite is true when a child is the victim of sexual abuse and the perpetrator is a member of the victim's immediate household. *State v. Rucker*, 847 S.W.2d 512, 518 (Tenn. Crim. App. 1992) *overruled on other grounds by McLeod*, 937 S.W.2d at 870 n.2. This is because physicians must address the unique emotional and psychological injuries that accompany abuse at the hands of members of the household. Identity is also relevant to prevent the victim from being returned to a dangerous environment and is "often necessary to diagnose the extent and likelihood of further harm to the victim." *Rucker*, 847 S.W.2d at 519 (quoting *State v. Maldonado*, 536 A.2d 600, 603(Conn. App. Ct. 1988)).

In *Rucker*, although the defendant was not living with the victim's family at the time, the Court found that he should be considered an immediate member of the same household because he had unfettered access to the victim's home and came there several times per week. *Rucker*, 847 S.W.2d at 520. In *State v. Livingston*, the Tennessee Supreme Court did not decide the issue of whether the identity of a perpetrator who was not a member of the household was pertinent to diagnosis and treatment, but tellingly noted that "circumstances may suggest that it is equally important to discover the identity of the perpetrator without regard to residence" in cases of the sexual abuse of a child. *State v. Livingston*, 907 S.W.2d 392, 397 n.4 (Tenn. 1995).

The defendant, while not a member of the victim's household, had strong ties to the victim and her family. The evidence at trial showed that the victim had stayed off and on at the defendant's home over a period of weeks and that she daily went swimming there. The defendant's family brought groceries to the victim's family and fed the victim and her cousin dinner. The identity of the defendant was reasonably pertinent to the victim's diagnosis and treatment in order to prevent the recurrence of abuse and to diagnose the likelihood of recurrence. Although not part of the evidence before the jury, the record in fact reflects that the victim recounted multiple instances of abuse to Nurse Taylor. Because the underpinnings of the rationale for allowing identification of a household abuser – to allow medical professionals to diagnose and treat psychological injuries and to diagnose and prevent the possibility of further harm – are also present here, the identification was properly admitted. Furthermore, the declarant's motivation for truthfulness is not diminished by the fact that the perpetrator was a close family friend rather than family member.

In like circumstances, this Court has concluded that hearsay statements regarding the identity of the abuser should be admitted under the 803(4) exception even when the perpetrator was not a member of the child's household. *State v. Chambly*, No. E2000-01719-CCA-R3-CD, 2001 WL 1028831, at *4 (Tenn. Crim. App. Sept. 7, 2001) ("The interests of the doctor for diagnosis and treatment to know the abuser's identity and the purpose of the victim's telling the doctor the abuser's identity – the foundation upon

which Rule 803(4) is based – remain the same regardless of whom the victim identifies."); *State v. Writer*, No. E2001-01062-CCA-R3-CD, 2003 WL 21339255, at *8 (Tenn. Crim. App. June 10, 2003) ("[B]ecause the defendant had regular access to the victim and because the victim and the defendant had a close relationship similar to one that the victim might develop with a member of his household, we find that the victim's statements identifying the defendant would be not be barred as hearsay and may be admitted under the rationale for admitting such statements in *Livingston*."); *cf. State v. Purvis*, No. CCA02C01-9412CC00278, 1995 WL 555052, at *6 (Tenn. Crim. App. Sept. 20,1995) (finding that "[a]lthough similar considerations may be present where the child is regularly exposed to and vulnerable to a perpetrator outside the family setting, the state did not show an adequate foundation"). We conclude the evidence was not admitted in error.

We also note that the victim testified at trial and identified the defendant as the man who raped her. Thus "it is hardly conceivable that the outcome of the trial would have been different" if the trial court had redacted the portion of the report in which the victim identifies the defendant. *McLeod*, 937 S.W.2d at 873. Because the victim also identified the defendant at trial, had it been error to admit the victim's identification, such error would have been harmless. *See* Tenn. R. App. P. 36(b).

## CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE